454 So.2d 1150 (1984)
STATE of Louisiana
v.
James FELO.
No. KA 1433.
Court of Appeal of Louisiana, Fourth Circuit.
July 16, 1984.
*1152 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Susan Scott Hunt, Asst. Dist. Atty., New Orleans, for plaintiff.
John M. Lawrence, Orleans Indigent Defender Program, New Orleans, for defendant.
Before BYRNES, CIACCIO and L. JULIAN SAMUEL, JJ.
L. JULIAN SAMUEL, Judge pro tem.
Shortly before Thanksgiving Day of 1982, Cathy Beasley sent her four-year-old daughter, Lakita, to stay with Rachel Knox, a neighbor who was at that time living with James Felo in a trailer house in Algiers. It was understood that Lakita would remain with them for only a few weeks.
On December 9, Knox informed Beasley that Lakita had disappeared while walking in the neighborhood with Felo. Upon being notified of the incident, New Orleans police conducted a series of fruitful interviews with Felo and Knox, and in the early morning of December 10, Felo led investigators to a wooded area near the west bank of the Mississippi River and there showed them the young girl's discarded remains. Felo and Knox were arrested and transported to police headquarters where they were held for further questioning.
An autopsy performed the same day revealed that Lakita's death had been caused by a subdural hematoma resulting from a dull blow to the head. The examining physician, Dr. Richard Tracy, concluded that the fatal injury had been sustained within the past three to five days. He also noted several fresh bruises and marks on the child's buttocks, arms, legs, chest, and face, and that one of the girl's arms and a wrist had been broken.
With this information, police continued their interrogation of the two arrestees. In a written statement, Felo admitted that he had disciplined Lakita on four or five occasions, at least once by whipping her with an electric wire. Felo also admitted that on the night of December 9, he twice struck Lakita in the head in a fit of anger, and that she died a short time later.
On the foregoing evidence, an Orleans Parish Grand Jury charged James Felo with the second degree murder of Lakita Beasley, a violation of La.R.S. 14:30.1. After a trial by jury, the defendant was found *1153 guilty as charged and was sentenced to serve the remainder of his life at hard labor, without benefit of parole, probation, or suspension of sentence. Felo now brings this appeal, urging reversal on the basis of ten assignments of error.

FIRST ASSIGNMENT OF ERROR
By his first assignment of error, the defendant contends that the trial court erred by refusing to appoint a sanity commission to determine whether Felo was competent to stand trial.
At the outset, we note that the question whether to appoint a sanity commission to inquire into the mental condition of the accused is a matter committed to the sound discretion of the trial judge, and absent a clear abuse of that discretion, his findings will not be disturbed. State v. Wilkerson, 403 So.2d 652 (La.1981); State v. Nix, 327 So.2d 301 (La.1975).
La.C.Cr.Pro. Art. 643 provides, in part, that "[t]he court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's capacity to proceed." Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense. La.C.Cr.Pro. Art. 641.
The accused bears the burden of proving by a preponderance of the evidence that there exists reasonable ground to doubt his capacity to proceed. State v. Wilkerson, supra; State v. Vincent, 338 So.2d 1376 (La.1976).
In State v. Bennett, 345 So.2d 1129 (La. 1977), the court addressed several considerations that bear upon the defendant's capacity to proceed, among them:
"whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. See, State v. Augustine, supra [252 La. 983, 215 So.2d 634 (1968)]; Robey, Criteria for Competency to Stand Trial: A Checklist for Psychiatrists, 122 Am.J. of Psychiatry, at 616; Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb. Hum.Rights L.Rev. at 245." Id. at 1138.
In support of his motion for the appointment of a sanity commission, the defendant presented a letter from the Louisiana Department of Health and Human Resources, co-authored by Julius M. Collum, M.D. and Barbara W. Murphy, a social worker. In sum, the document states that a psychiatric evaluation of the defendant conducted in 1976 revealed him to be "aggressive, moody, withdrawn" and unable to effectively participate in group therapy. The defendant offered a second document containing his own school records, wherein it was noted that in 1974, a psychiatrist recommended that he undergo individual psychotherapy.
The defendant also presented the testimony of Rev. Roy Humphrey, who stated that during the many years he had known Felo, he had observed the defendant to be a withdrawn, slow learner. The Reverend also described Felo as plagued by a paralyzing fear of authority figures, such that when a superior commanded him to carry *1154 out even simple tasks, Felo was unable to maintain the concentration necessary to perform them.
On motion of defense counsel, the court also interrogated the defendant himself. Felo testified that he had discussed the case with his attorney and understood the charges against him; that he knew that if convicted, he would serve a life term; that he had given his attorney the names of his witnesses; that he had no memory difficulties; and that there was no reason why he could not assist counsel in the defense of his case.
We find no basis upon which to hold that the trial court clearly abused its discretion in refusing to appoint a sanity commission. None of the evidence adduced at the hearing pertained to the defendant's present mental state. The most recent psychiatric evaluation was that which was obtained in 1976, seven years earlier.
Moreover, even if it were assumed that Felo's earlier psychiatric evaluation remained valid as of the time of the hearing, the trial court did not clearly abuse its discretion in denying defendant's motion. Even when viewed in a light most favorable to the defendant, the evidence and testimony demonstrated merely that Felo was a slower than average learner who sometimes responded inappropriately to authority figures. These facts alone do not establish reasonable grounds to doubt the defendant's capacity to proceed. Through direct interrogation of the defendant, the trial judge determined that despite Felo's reported deficiencies, he was well aware of the charges facing him and was capable of assisting his attorney in a meaningful way. We find no clear error in that determination.
Accordingly, we hold that the defendant's first assignment lacks merit.

SECOND ASSIGNMENT OF ERROR
By this assignment, the defendant contends that the trial court erred by refusing to grant his motion to suppress a written inculpatory statement.
The statement to which Felo refers is that given to Det. Cyril Davillier and witnessed by Det. Ronald Doucette at the New Orleans Police Department Homicide Office on the morning of December 10, 1982. In the preface to this typewritten colloquy with Det. Davillier, Felo affirms that he had been advised of his constitutional rights and that his statement is the product of his own free will. There follows the defendant's narration of the events which immediately preceded the child's death. Most notable are Felo's admissions that only a few hours before Lakita died, he lost his temper and struck her in the head, and that he beat the child on four or five previous occasions.
Det. Davillier testified that he himself typed the statement while Felo spoke, and that the document is a verbatim account of the defendant's conversation from beginning to end. Felo insists, however, that the only authentic part of the document is his own signature, and that every word of the statement was fabricated by Davillier. At the motion to suppress and at trial, Felo testified that during the interrogation, Detectives Davillier and Doucette repeatedly knocked him out of his chair with punches and kicks to the abdomen. The defendant also stated that the detectives promised to continue this treatment until he cooperated by signing the statement, and that but for the abuse he received, he would not have signed.
In support of this contention, Felo offered the testimony of Rachel Knox, who was also detained at the homicide office only a few feet from the cubicle where the defendant was interviewed by Det. Davillier but out of sight of the participants in that interview. According to Knox, a considerable clamor arose from the cubicle during the defendant's interrogation, the distinct sound of Felo being beaten and falling out of his chair. Knox also stated that she could hear policemen yelling at Felo to "get up", and that the officers told Felo that unless he admitted to having murdered Lakita, they would take him *1155 somewhere and beat him until he confessed.
In weighing the merits of this second assignment, we are guided by the principle that a trial court's ruling on the admissibility of statements is entitled to considerable deference and will not be disturbed "unless not supported by the evidence". State v. Harper, 430 So.2d 627, 633 (La.1983); State v. Burkhalter, 428 So.2d 449 (La.1983); State v. Dewey, 408 So.2d 1255 (La.1982).
We find no error in the present case. Detectives Davillier and Doucette testified that the interrogation took place in the major offense bureau at police headquarters, a large office occupied not only by the homicide division, but also the rape squad and the armed robbery division. In this office are many open cubicles typical of those that might be found in a college library. It was in these cubicles that Felo and Knox were questioned. Davillier and Doucette testified, without contradiction, that during normal working hours, the office is open to many visitors, including laymen, prosecutors, defense attorneys, and occasionally, the press. The officers stated, moreover, that at the time of Felo's interrogation (11:25 a.m.), the office was quite busy with the coming and going of such visitors as well as regular police personnel.
These circumstances lend credibility to Davillier's and Doucette's specific denial that they or anyone else had beaten or intimidated Felo in order to secure his statement. Moreover, Deputy Herbert Craig, the booking officer at Central Lock-up, testified that at the time of Felo's booking, he asked Felo whether he was injured, and the defendant's response was "No". Davillier stated that Felo was booked almost immediately after giving his statement.
Finally, Knox's testimony was in significant conflict with Felo'swhereas the defendant insisted that Det. Davillier alone meted out the abuse, Knox testified that it was someone other than Davillier who committed those acts.
In finding the defendant's statement to have been voluntarily given, the trial court expressed its belief that Felo's and Knox's testimony concerning police abuse was "incredible and completely uncorroborated". The record contains ample support for that determination, and we therefore find the defendant's second assignment to be without merit.

THIRD ASSIGNMENT OF ERROR
The defendant contends that the trial court erred in permitting the State to introduce evidence of the defendant's prior crimes, in particular, Felo's physically abusive treatment of the child over the course of two weeks prior to her death.
Prior to trial, the State formally notified the defense of its intent to introduce evidence of Felo's brutality towards Lakita to prove "system and intent". The appellant's motion to prohibit the use of such evidence was denied.
At trial, Dr. Richard Tracy (the pathologist who performed the autopsy) testified that much of Lakita's body was covered by swollen striations suggestive of the marks that would be caused by beating with a switch. The doctor also testified that Lakita's left forehead was swollen, as were her right eye and right ear. Her upper right arm had a distinctive switch mark which passed across the chest and onto the arm in one continuous line; the right arm was broken. The left wrist was swollen and slightly bent; x-rays confirmed that, in fact, it too had been broken.
Rachel Knox testified that Felo had whipped Lakita, once with an electrical wire and twice with a narrow belt. Knox also testified that on one occasion, she told Felo to stop spanking the child, and that he responded, "Shut up".
The State's evidence included Felo's own written statement that he had beaten Lakita "about four or five" times, and that shortly before Lakita's death, he struck her twice on the top of the head.
*1156 The defendant contends that the State's presentation of such prior crimes evidence was a subterfuge whose only purpose was to depict him as a bad character.
La.R.S. 15:445 provides that:
"In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction."
La.R.S. 15:446 provides that:
"When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged."
Under the above provisions, evidence of the defendant's prior similar acts is relevant to prove that the act for which the defendant is charged was not committed accidentally, unintentionally, or inadvertently. State v. Kahey, 436 So.2d 475, 489 (La.1983); See also McCormick, Evidence § 190 at 450 (Cleary ed. 1972). Being relevant, such evidence is admissible, provided that there is a real and genuinely contested issue of intent at trial, State v. Monroe, 364 So.2d 570 (La.1978); State v. Nelson, 357 So.2d 1100 (La.1978); State v. Kahey, supra; and further, that the prejudicial effect of such evidence is outweighed by its probative value. State v. Harris, 383 So.2d 1 (La.1980); State v. Prieur, 277 So.2d 126 (La.1973).
In the present case, the defendant's intent was squarely placed in issue when defense counsel, prior to trial, requested special jury charges relating to the crime of manslaughter, La.R.S. 14:31, which provides, in pertinent part:
Manslaughter is:
(1) A homicide which would be murder under ... Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person;...
The jury was instructed according to the above statute and defense counsel couched his argument to them in those (among other) terms. Now on appeal, Felo again argues that the State had not proved his possession of the requisite intent for second degree murder. (See Assignments of Error Numbers Eight and Nine). Thus, it cannot be seriously urged that intent was not a genuine issue at trial.
Moreover, the prior acts of brutality committed by Felo against young Lakita were unquestionably similar to that for which the defendant was chargedeach was an act of brutality calculated to inflict great bodily harm. See State v. Germain, 433 So.2d 110 (La.1983), State v. Kahey, supra; State v. Davis, 411 So.2d 2 (La.1982).
Finally, the probative value of the evidence presented by the State was substantial, and clearly outweighed any prejudicial effect which its introduction may have produced.[1] The defendant maintained *1157 throughout that the victim's mortal injury was suffered when she slipped and fell in the bathroom, striking her head against the toilet. A similar claim was asserted in State v. Davis, supra, where the defendant charged in a beating death (there, too, a fatal subdural hematoma) insisted that the victim's head injury was caused by a fall. There, evidence of the defendant's prior brutalities toward the victim was held to be substantially probative, i.e., useful in reducing the possibility that the death was an accident, or that the act in question was done with innocent intent. See also State v. Kahey, supra, at 489; State v. Germain, supra. The evidence of prior acts offered by the State in this case proved an unmistakably malicious intent on the part of the defendant to do serious harm to the victim. As in Davis, supra, we hold that the evidence did not unfairly prejudice the defendant, and that its use by the State was legitimate in proving the intent of the accused.
Recent jurisprudence has also sanctioned the use of a parent's prior acts of brutality towards a child as admissible to prove the identity of the parent as the wrongdoer in a prosecution for child abuse or murder, provided that identity is a genuinely contested issue at trial and that the prior brutalities are "so nearly identical in method as to weigh substantially on the proof of identity in the charged crime." State v. Humphrey, 412 So.2d 507 (La.1982) (on rehearing). It is noteworthy that the prior abuses need not be so distinctive as to constitute "signature crimes"; it is enough that the prior acts bear such substantial similarity to the crime charged that their relevancy to the issue of identity clearly outweighs their prejudicial effect. Humphrey, supra, at 521; State v. Germain, supra; State v. Kahey, supra.
In the present case, the prosecution offered in evidence the defendant's own statement that he had struck the victim twice on the top of the head on the night she died. Defendant also admitted having beaten the child on several previous occasions, and the coroner's examination proved that indeed the victim had been terribly abused. These acts possessed such substantial similarity to the act for which Felo was chargedthe infliction of the fatal subdural hematomathat their relevance and probity on the issue of identity clearly outweighed their prejudicial effect. Accordingly, we hold that the trial court did not err in allowing the State to introduce evidence of the beating inflicted upon the victim on the night she died and on previous occasions.
The appellant's third assignment of error is without merit.

FOURTH ASSIGNMENT OF ERROR
By this assignment, appellant contends that the trial court erred in permitting the State to offer evidence concerning scientific tests, x-rays of the murder victim, the results of which were not furnished to the defendant as requested in pre-trial discovery.
In his Prayer for Oyer, the appellant requested the results of "any and all scientific tests made in the investigation of this case..." The prosecutor responded that the State would make all such tests available, and orally advised defense counsel that the State would seek to introduce at trial the x-rays showing fractures in the victim's left wrist and upper right arm. The prosecutor also advised the defense, however, that these x-rays had been misplaced and were not immediately available for inspection, but that when the films were located, the defense would be notified.
As of the second day of trial, the defense still had not seen the films, despite the fact *1158 that the prosecution had located them several days earlier. Consequently, the defense filed a motion to prohibit the State's use of the x-rays and all testimony and evidence related to them. The trial court denied the motion, whereupon the State offered the expert testimony of Dr. John Lee Moss, who interpreted the x-rays to the jury in the form of oral testimony and written findings. These findings were later introduced into evidence.
Pursuant to La.C.Cr.Pro. Art. 719, a defendant may inspect, copy, etc. any results or reports of scientific tests "made in connection with or material to" his case within the custody, possession, or control of the State and which are intended for use at trial. Additionally, the State has a continuing duty under La.C.Cr.Pro. Art. 729.3 to disclose such evidence when it comes within the State's control. State v. Sweeney, 443 So.2d 522, 527 (La.1983); State v. Strickland, 398 So.2d 1062 (La.1981).
The Supreme Court has long held that the purpose of discovery rules as set forth by the Code of Criminal Procedure is to "eliminate unwarranted prejudice which could arise from surprise testimony", State v. Mitchell, 412 So.2d 1042, 1044 (La.1982); State v. Toomer, 395 So.2d 1320 (La.1981); especially where the defendant may be lulled into a misapprehension of the strength of the State's case. State v. Sweeney, supra. However, failure by the State to disclose will not automatically require reversal of a conviction. The defendant must prove that he was prejudiced by the State's failure to disclose before a reversal is warranted. State v. Rault, 445 So.2d 1203 (La.1984); State v. Sweeney, supra; State v. Arnaud, 412 So.2d 1013 (La.1982); State v. Mitchell, supra; State v. Strickland, supra.
On appellate review, the court must examine the record to determine "whether any such prejudice which may have resulted from the non-compliance caused the trier of fact to reach the wrong conclusion." Sweeney, supra; State v. Ray, 423 So.2d 1116, 1119 (La.1983).
Applying the above principles, we hold that it was error for the lower court to deny the defendant's motion and to allow the case to immediately proceed with the State's presentation of the questioned evidence. Under La.C.Cr.Pro. Art. 729.5, the defense was, at the very least, entitled to a recess to allow time to inspect the x-rays and the report of Dr. Moss.
Nevertheless, we fail to detect any real prejudice engendered by the error, and in fact the appellant alleges none here. The defense had been notified as to the substance of Dr. Moss' testimony and was aware that the x-rays depicted the victim's broken limbs. Moreover, the evidence was overwhelming that Lakita's left wrist and right arm were indeed fractured. Even the most skillful cross-examination would not have changed that fact, nor is it conceivable that given adequate time to review the x-rays, the defense might have countered their effect upon the jury by presenting opposing medical testimony. In sum, we are convinced that even if the defense had been permitted to inspect the evidence prior to trial, the jury's verdict would have been the same.
Accordingly, we find the defendant's fourth assignment of error to be without merit.

FIFTH ASSIGNMENT OF ERROR
By this assignment of error, the appellant argues that the trial court erred in failing to grant a mistrial based upon allegedly prejudicial remarks by the prosecutor during voir dire.
In addressing prospective jurors on the subject of the defendant's presumption of innocence, the assistant district attorney stated:
"When you are asked to determine what the facts are, one thing that you're going to have to do, you're going to have to consider all the testimony of everybody who testifies. As Mr. Felo sits here right now, he is considered to be innocent by law. No matter what he's done in the past, as he sits here right now, he's *1159 considered to be." Tr. 1. (Emphasis added).
Before the prosecutor finished his sentence, defense counsel objected to the remark as falling under La.C.Cr.Pro. Art. 770 and requested a mistrial. The motion was denied, but the court did admonish the jury to disregard the remark.
The trial court clearly did not err in refusing to grant a mistrial. Article 770(2) prohibits direct or indirect references to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. Taken in context, the prosecutor's remark did not refer to any crime as to which evidence is inadmissible; indeed, it does not refer to any crime at all. It merely expressed (at worst, inartfully) that the defendant is presumed to be innocent until the State proves otherwise.
This assignment of error lacks merit.

SIXTH ASSIGNMENT OF ERROR
By this sixth assignment, the appellant contends that the trial court erred by failing to grant a mistrial following the prosecutor's misconduct in addressing leading questions to a State's witness on direct examination.
During the exchange between the assistant district attorney and witness Knox, she stated that on one occasion when Felo was whipping Lakita with a narrow belt, she (Knox) told him to stop, and that Felo shouted back, "Shut up". When the prosecutor asked her what happened next, Knox replied that Felo left the room. Apparently this was not the expected response, for the prosecutor then asked: "You don't remember what else he did?" Knox answered "No". Again the prosecutor asked: "Do you remember that he told you he whipped her with the extension cord?" Tr. 39. The defense objected as to the leading nature of the question and requested a mistrial.
Although the prosecution was properly admonished to refrain from asking leading questions on direct examination, the trial court did not err in refusing to grant a mistrial. The witness had already testified (several moments earlier) that Felo had personally admitted having whipped the child with an electrical cord. Tr. 34. Moreover, the defendant himself later admitted (twice) the truth of the statement. Tr. 105, 120. The leading questions, therefore, were not so prejudicial as to require reversal.
This assignment of error lacks merit.

SEVENTH ASSIGNMENT OF ERROR
By this assignment, appellant contends that the trial court erred in admitting into evidence a hearsay document, namely, a copy of the defendant's arrest register.
On direct examination, the defendant testified that he had been molested by police interrogators and forced to sign an inculpatory statement. On cross-examination, the prosecution sought to impeach Felo by questioning him about certain contradictory statements made to the booking officer at Central Lock-up. Specifically, Felo was asked whether he remembered telling the booking officer that he had not been injured. (It is a regular policy that booking officers question arrestees as to their physical condition). Felo answered that he did not remember having been asked about any injuries, and further, that he did not tell anyone that he was not injured. The prosecutor then showed Felo a copy of the police Arrest Register, wherein the following appears:
"If injured describe by whom and if treated; if intoxicated describe to what degree"
"No".
Felo viewed the form and authenticated it as having been issued by the booking officer. (The defendant had received a copy from the booking officer.) Felo again denied having made any such statement. The prosecutor then introduced the document into evidence over the defendant's hearsay objection.
We hold that the court did not err in admitting the arrest register into *1160 evidence. Although it is clear that the document would have been hearsay if offered to prove the truth of the matter asserted therein, nevertheless, there remained a legitimate, though limited, alternative purpose in offering the evidence, e.g. to impeach the defendant through the use of a prior inconsistent statement. La. R.S. 15:493[2]. The evidence was therefore admissible over a hearsay objection.[3]
The appellant also contends that the arrest register contained references to other crimes, evidence of which was inadmissible. He argues, further, that the deletion of those references did not cure the prejudice, because the jury could still infer such prior arrests from the face of the document.
We disagree. Entries in the arrest register have been deleted so effectively that this court cannot discern whether the defendant had ever been arrested prior to December 10, 1982, nor could the jury have inferred such arrests from the face of the document.
This assignment lacks merit.

EIGHT AND NINTH ASSIGNMENTS OF ERROR
By these assignments, the appellant contends that the trial court erred in denying defendant's motion for a new trial and in denying his motion for post-verdict judgment of acquittal. Specifically, appellant argues that the evidence was insufficient to prove either identity, causation, or specific intent to kill or inflict great bodily harm.
Appellant's claim arises under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There it was held that in reviewing a defendant's conviction for sufficiency of the evidence, the court must determine whether, viewing the evidence in a light most favorable to the prosecution, any rational juror could have found the defendant guilty beyond a reasonable doubt. The standard to be applied under Jackson, supra, is not altered by the fact that in the present case, the State's evidence as to causation, identity, and specific intent was circumstantial, for although it is the statutory rule that such evidence, in order to convict, must remove every reasonable hypothesis of innocence, (La.R.S. 15:438), due process of law requires no greater burden than that the State prove each element of the offense beyond a reasonable doubt. Jackson v. Virginia, supra; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954);[4]State v. Wright, 445 So.2d 1198 (La.1984); State v. Camp, 446 So.2d 1207 (La.1984); *1161 State v. Chism, 436 So.2d 464 (La.1983). Ultimately, the difference is purely one of semantics, for when there exists a reasonable hypothesis of innocence, there is necessarily a reasonable doubt as to guilt. Holland, supra; Wright, supra; Camp, supra. Therefore, for the sake of simplicity and uniformity of judicial expression, the test to be applied when reviewing the sufficiency of evidence in a circumstantial case is that which was announced in Jackson.
Regarding causation and identity, the defendant maintains that the State's evidence as to how the child received the fatal injury was purely circumstantial and did not remove the reasonable hypothesis that Lakita died as the result of a fall, or that the killing blow could have been delivered by Rachel Knox or even by Cathy Beasley, the child's mother.
The defendant calls this court's attention to the testimony of Rachel Knox, who stated that when she first received Lakita from her mother shortly before Thanksgiving, the child showed signs of having been beaten: there were bruises on her legs, back, and buttocks and there was a large and noticeable area on the top of her head which was soft to the touch.
At trial, Felo denied having told the police that he had struck Lakita in the head on the night she died. According to Felo, death occurred as a result of the following incident: Lakita was in the bathroom alone while the defendant was in the kitchen washing the dishes; and Knox was in bed. A loud noise in the bathroom informed Knox that the baby had fallen, and so she told Felo to see what had happened. When he entered the bathroom, Lakita was lying on the floor in a pool of blood. Felo picked her up, washed her, then put her to bed. A short while later when Felo returned to Lakita's bedroom, he found her sprawled across the fan, unconscious, but still breathing. He again put her in bed and left the room. Upon returning shortly afterward, Felo discovered that Lakita had died.
Rachel Knox's testimony concerning the foregoing event was substantially the same. She added, however, that on the previous night, an almost identical incident took placeFelo was in the kitchen washing dishes, Lakita was in the bathroom alone, and Knox was in bed; there was a loud sound in the bathroom; Felo investigated and found that Lakita had fallen and hurt herself.
In contradiction to the defendant's exculpatory account, the State presented the expert testimony of a pathologist, Dr. Richard Tracy, who stated that Lakita died as a result of a subdural hematoma, and that this injury occurred approximately three to five days prior to the autopsy performed on December 10, 1982. By all accounts, death occurred on December 9.
Viewing the foregoing evidence in a light most favorable to the State, any rational juror could have concluded that: 1) the hematoma was suffered too recently to have been caused by Cathy Beasleyshe had not seen the child since before Thanksgiving; and 2) the hematoma was too old to have been caused by an accidental fall on the night the child died.
Any rational trier of fact could have also concluded that, beyond a reasonable doubt, the subdural hematoma had been inflicted by James Felo, the defendant. As we stated earlier, proof of a defendant parent's prior abuse of a child is highly relevant to prove the identity of that parent as the offender who caused the child's death. State v. Germain, supra; State v. Humphrey, 412 So.2d 507 (La.1982). In the present case, the State offered irrefutable evidence that Lakita had suffered the most extreme abuse while in Felo's custody. In his own statement to homicide detectives, Felo admitted having beaten the child on four or five previous occasions, at least once with an electrical wire, and indeed switch marks were found over her entire body. He himself stated to police that he struck Lakita twice on the top of the head only a few hours before she died. Moreover, it was Felo who had concealed the child's body underneath the Mississippi River Bridge. Thus, the jury could have rationally concluded that, beyond a reasonable *1162 doubt, it was Felo and not Knox who had inflicted the fatal subdural hematoma several days prior to death.
Alternatively, appellant contends that the State had not sufficiently proved the requisite specific intent to sustain a conviction for second degree murder. He argues that, at most, the State's evidence is sufficient to prove the defendant's commission of simple battery without specific intent to do great bodily harm, and therefore, that the most severe offense of which he is guilty is misdemeanor manslaughter. La. R.S. 14:31(2)(a).
We do not agree. Wholly aside from the fatal subdural hematomawhich itself speaks rather clearly of the defendant's intent to do great bodily harmthe defendant's self-admitted pattern of abuse toward the child admits no reasonable doubt that it was Felo's specific intent to inflict serious injury upon the victim.
Accordingly, we hold that the State presented sufficient evidence at trial to prove the elements of causation, identity, and specific intent. The defendant's eighth and ninth assignments of error are therefore without merit.

TENTH ASSIGNMENT OF ERROR
By this last assignment of error, the defendant contends that the trial court erred in refusing to give special requested jury charges, numbers one (last paragraph), three, four, five, six, and eight.
La.C.Cr.Pro.Art. 807 provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is included in the general charge or in another special charge to be given.
The court must charge the jury, when properly requested, as to the law applicable to any theory of defense that the jury could reasonably infer from the evidence presented. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Telford, 384 So.2d 347 (La.1980).
Appellant complains that the trial court erred in not charging the jury as specially requested in the last paragraph of charge number one. That charge concerns homicide that occurs when the offender had no specific intent to kill or inflict great bodily harm but was engaged in the commission of any intentional misdemeanor (such as simple battery) or aggravated battery at the time of the homicide. The trial judge sufficiently instructed the jury that specific intent to kill or to inflict great bodily harm was an absolute requisite for conviction on a charge of second degree murder. Moreover, the court gave an accurate and complete charge on misdemeanor manslaughter. We therefore find no error in the trial judge's refusal to give the requested charge.
Requested charge number three concerned negligent homicide; requested charge number four concerned criminal negligence. The trial judge refused to give these instructions because there was no evidence or testimony to support a finding that the victim's fatal injury was received as a result of negligence. As presented by the State, the case concerned a homicide rooted in specific intent; the defendant maintained that the child fell while in another room. Neither party put forth evidence of criminal negligence. The trial court was therefore correct in refusing to give the defendant's third and fourth charges. Johnson, supra; Telford, supra.
Defendant's special charge number five concerned the concept of "reasonable doubt", specifically, that reasonable doubt which arises from a lack of evidence against the accused as well as that which is created by incredible testimony on the part of the State's witnesses. We conclude that the trial judge's instruction on these matters *1163 sufficiently included the defendant's requested charge, and therefore, that the court did not err in refusing to charge in the requested manner.
Special requested charge number six sought to instruct the jury that a defendant's confession or inculpatory statement must be shown beyond a reasonable doubt to have been given voluntarily; that any reasonable doubt is to be resolved in favor of the defendant; and that unless the State carried its burden of proof on that issue, the jury is duty-bound to disregard the statement entirely.
To the extent that the foregoing instruction may have led a juror to conclude that the initial question of admissibility was his to decide, the instruction was erroneous and was properly rejected by the trial court. "Once the trial judge has determined that the confession is admissible, any evidence submitted to the jury regarding the circumstances surrounding the obtaining of the confession is solely for the purpose of determining the effect or weight to be given the statement. C.Cr.P. 703". State v. Sears, 298 So.2d 814, at 821 (La. 1974) (emphasis ours); see also, State v. Glover, 343 So.2d 118 (La.1977). Those parts of the requested charge that were correctly stated were sufficiently addressed by the trial court.
Similarly, special requested charge number eight creates the impression that not only the weight and effect, but the admissibility of the defendant's inculpatory statement are to be judged by the jury. The trial judge was, again, correct in refusing to give such a charge. The trial court's charge was sufficient to address those parts of the requested charge that were correctly stated.
The defendant's tenth assignment of error is without merit.

CONCLUSION
For the reasons assigned, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] We note, parenthetically, that by "prejudicial", it cannot be meant simply "damaging"; if that were true, then any evidence which is probative would be "prejudicial". But it is only unfairly prejudicial evidence that cannot be admitted, State v. Germain, supra, and as one court has noted, "unfair prejudice results from an aspect of the evidence other than its tendency to make the existence of a material fact more or less probable, e.g., that aspect of the evidence which makes conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Bailleaux, 685 F.2d 1105 (9 Cir.1982).
[2] La.R.S. 15:493 provides:

"Whenever the credibility of a witness is to be impeached by proof of any statement made by him countradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible."
[3] Prior inconsistent statements are not admissible as substantive evidence, but only as impeachment. The burden is upon the defendant, however, to request a limiting instruction to that effect, and in the absence of such a request, the court's failure to instruct is not reversible error. State v. Ray, 249 So.2d 540 (La.1971).
[4] In Holland, supra, the Court criticized the practice of instructing juries that where the prosecution's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than guilt. "[T]he better rule", the Court stated, "is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect. [citing 1 Wigmore, Evidence (3d ed.), 25-26 and other federal court precedent] ... If the jury is convinced beyond a reasonable doubt, we can require no more."

We do not imply from the foregoing that a trial judge in this state may correctly refuse to charge the jury in accordance with La.R.S. 15:438indeed, where the case is circumstantial, it may be error to refuse such a charge. Our point is simply that which was stated in Wright, Camp, and Chism, infraupon appellate review for sufficiency of evidence, R.S. 15:438 is at most a helpful tool for deciding whether there exists a reasonable doubt as to guilt.